1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

FLORENTINO REYES SANTANA,    )
                             )
        Petitioner,          )    No. CV-01-0226-TUC-DCB (BPV)
                             )
vs.                          )    **REPORT AND RECOMMENDATION**
                             )
TERRY STEWART, ET AL.,       )
                             )
        Defendant.           )
_____)

On May 16, 2001, Florentino Reyes Santana, ("Petitioner"), an inmate confined by the State of Arizona, filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody, pursuant to Title 28, U.S.C. § 2254 ("Petition").  Named as Respondent in the Petition is Terry L. Stewart.  The Attorney General of the State of Arizona is named as an additional Respondent.  Respondents filed an Answer ("Answer") to the Petition on November 5, 2001, with exhibits A through AA attached.

Pursuant to the Rules of Practice of this Court**,** this matter was referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation.

On April 30, 2002, Petitioner filed a motion to stay the Petition pending review of a new constitutional claim by the state court.  This Court, noting that the Petitioner had alleged that the trial court judge had already made a *prima facie* finding that his new claim was cognizable as a significant change in the law and had appointed counsel, directed the Attorney General to provide the Court with a copy of the new state petition and the trial court's minute entry.  The Attorney General did not submit the documents and this Court granted the stay over objections by Respondents.

1    The stay was lifted on April 20, 2005, and supplemental briefing was completed
2    on the Petitioner's most recent claim presented to the state courts on June 8, 2005.

3    On July 11, 2005, the Petitioner filed a motion to amend the complaint, which
4    this Court grants in a separate order filed contemporaneously with this report and
5    recommendation.

6    The Magistrate Judge recommends that the District Court, after its independent
7    review of the record, enter an order dismissing the Petition.

8

9    **FACTUAL AND PROCEDURAL BACKGROUND**

10   On November 21, 1985, Petitioner was tried before a jury on one count of First
11   Degree Murder, a Class One Felony, in the Superior Court for the State of Arizona,
12   Pima County.  (Answer, Ex. C.)  Petitioner was found guilty of first-degree murder and
13   the jury found the offense to be of a dangerous nature.  (Answer, Ex. E, p.92)  On
14   December 20, 1985, the trial court sentenced Petitioner to life without possibility of
15   parole for twenty-five years.  (Answer, Ex. F, p. 11.)

16   ***Pre-trial motions***

17   Prior to trial, the trial court granted the State's *motion in limine* as to drug use
18   prior to the day in question by any of the witnesses.  Petitioner argued against this
19   motion asserting that this evidence was relevant to his theory of the case, specifically,
20   that Robert Pintado killed the victim over a drug deal.  (Answer, Ex. C, p.3-6.)
21   Petitioner also argued that he should be allowed to argue that Pintado had a drugs-for-
22   sex business relationship with some of the witnesses in this case, and that those
23   witnesses were prostitutes who had a motive to lie for Pintado.  (Answer, Ex. C, p.6-9.)
24   The court granted the State's *motion in limine* as to prior acts of prostitution as to the
25   witnesses.  (Answer, Ex. C, p.9.)  Petitioner also argued that he should be allowed to
26   demonstrate the prior bad acts of the victim, including convictions for drugs and for
27   assault with a deadly weapon, in an effort to show that the victim had previously

28

1  possessed a weapon, and had been involved in dealing drugs.  (Answer, Ex. C, p.11-
2  12.)  The trial court ruled that he would not allow the evidence of prior bad acts, but
3  allowed that an offer of proof could be made when Petitioner's witnesses showed up at
4  trial.  (Answer, Ex. C, p.15.)  The trial court also denied Petitioner's request to present
5  evidence that at the time of autopsy, there was evidence of marijuana in the victim's
6  blood or urine.  (Answer, Ex. C, p.16-18.)

7  ***Testimony***

8      Petitioner was tried for the first degree murder of his godson following the
9  godson's baptismal party.  The facts as elicited at trial are as follows:

10      Robert Pintado testified on behalf of the state.  (Answer, Ex. C, p.189.)  Pintado,
11  of Cuban ancestry, originally became acquainted with Petitioner after Petitioner arrived
12  on the Cuban boatlifts and was transferred to Tucson.  (Answer, Ex. C, p.191.)  Pintado
13  and Petitioner were well acquainted, Petitioner having worked for Pintado for a year,
14  and having lived with Pintado for several months.  (Answer, Ex. C, p.191-193.)
15  Pintado was not well acquainted with the victim.  (Answer, Ex. C, p. 194.)  Pintado did
16  not go to the victim's baptism, but did go to the parties afterward.  (Answer, Ex. C,
17  p.195.)

18      Following a baptismal party at a friend's house, Pintado, Petitioner, the victim,
19  and Petitioner's wife  ended up at a bar called "The Stop."  (Answer, Ex. C, p.197-198.)
20  Petitioner drove his wife home, and came back to The Stop.  (Answer, Ex. C, p. 198.)
21  Pintado danced with a woman nicknamed Cookie that night, but didn't remember
22  buying her a drink.  (Answer, Ex. C, p.199.)  Cookie asked if he had cocaine, to which
23  he replied affirmatively, and she invited him to her apartment.  (Answer, Ex. C, p.199.)
24  Pintado testified that the cocaine belonged to Petitioner, but Pintado carried it because
25  Petitioner believed that Pintado was less prone to being stopped by police than
26  Petitioner, because Petitioner was black.  (Answer, Ex. C, p.200.)

27

28

1    Pintado left the bar with Cookie and some girls in Petitioner's car, with Petitioner

2    driving and the victim sitting in front. (Answer, Ex. C, p.202.) Petitioner and the

3    victim were arguing in an agitated manner in the car. (Answer, Ex. C, p.203.) When

4    they arrived at the apartment, Petitioner pulled a gun out from under the front seat of

5    the car. (Answer, Ex. C, p.204.) Pintado heard the victim pushing Petitioner to fight

6    him. (Answer, Ex. C, p. 205.) Pintado convinced Petitioner to put the gun away and

7    get back in the car. (Answer, Ex. C, p. 206.) Petitioner was planning on leaving the

8    victim there, but he dashed back into the car. (Answer, Ex. C, p.207.)

9    Leaving the apartments, Petitioner turned right on Craycroft Rd., and Petitioner

10   and the victim started arguing again. (Answer, Ex. C, p.207.) The victim was very

11   drunk. (Answer, Ex. C, p.207.) After a while, Petitioner pulled the car over, and the

12   victim got out. (Answer, Ex. C, p. 208.) Petitioner got the gun out of the car and shot

13   the victim. (Answer, Ex. C, p.208.) Petitioner got back in the car, and drove away.

14   (Answer, Ex. C, p.211.)

15   Petitioner and Pintado went to a woman's house and dropped off the gun.

16   (Answer, Ex. C, p.212.) Pintado knew the woman, named Barbara, but she was not a

17   friend of his. (Answer, Ex. C, p. 212.) Pintado described her as Petitioner's "part-time

18   mistress." (Answer, Ex. C, p.213.) Petitioner then drove Pintado to Pintado's house.

19   (Answer, Ex. C, p.214.) The next day, Pintado went to Petitioner's house to pick up his

20   car, and Petitioner told Pintado that he was taking the victim's car to San Francisco.

21   (Answer, Ex. C, p.216.)

22   Later, Petitioner told Pintado to pick up the gun and take it to Lazaro. (Answer,

23   Ex. C, p. 217-218.) At some point, Petitioner had Pintado get the gun from Lazaro and

24   keep it himself. (Answer, Ex. C, p. 219.) Pintado didn't want to have the gun at his

25   house, so he gave it to a friend at work, Mark Rhoudybush. (Answer, Ex. C, p. 219.)

26   Pintado wired Petitioner six hundred dollars in San Francisco. (Answer, Ex. C,

27   p.220.) The money was Petitioner's, but Pintado kept it because Petitioner would spend

28

- 4 -

1   it too fast otherwise.  (Answer, Ex. C, p. 220.)  Pintado picked up Petitioner, his wife,

2   and two other people he had never met before, and took them to the house where the

3   baptismal party had taken place.  (Answer, Ex. C, p. 221.)  In conversation, Petitioner

4   implied that the victim got what he deserved and implied that if anybody would say

5   anything, he would take car of them, too.  (Answer, Ex. C, p. 221.)

6        After Petitioner was arrested, Pintado agreed to try to fix an alibi for him.

7   (Answer, Ex. C, p. 223.)  Petitioner's wife called Pintado over to her apartment so he

8   could review the police reports.  (Answer, Ex. C, p.224.)  Pintado spoke with Petitioner

9   on the phone, and was told that Pintado's name "had been already mentioned."

10  (Answer, Ex. C, p. 225.)  Because his name was already out, Pintado decided to call

11  Detective Pantke the next day.  (Answer, Ex. C, p. 226.)

12       Pintado testified at the preliminary hearing, but admitted during trial that he lied

13  about having drugs on him, and didn't mention anything about taking the gun to

14  Barbara's house.  (Answer, Ex. C, p. 227.)  Pintado later agreed to tell the truth if the

15  prosecutor's would agree to not prosecute him for the drugs, or for perjury during the

16  preliminary hearing.  (Answer, Ex. C, p. 228-229.)

17       Dewanna Lawson, known as "Cookie," testified that she was out with her two

18  friends and her sister on the evening of March 3, 1985, and ended up at a bar called The

19  Stop.  (Answer, Ex. C, p.57-62.)  Lawson met Petitioner, his wife, the victim and

20  Pintado at the bar.  (Answer, Ex. C, p.62-63.)  Lawson danced with Pintado, and later

21  asked him for some cocaine and for a ride home.  (Answer, Ex. C, p.64-67.)  Outside

22  the bar, Lawson saw Santana drive up, get something from the trunk of the car, and put

23  it in the front.  (Answer, Ex. C, p.68.)  Lawson and her friends, Pintado, Petitioner and

24  the victim all got in the car.  (Answer, Ex. C, p.69.)  Petitioner drove to Lawson's

25  apartment complex at Craycroft and 22nd Street.  (Answer, Ex. C, p.70-72.)

26       When they arrived at Lawson's apartment complex, Lawson went inside her

27  apartment to see if  her brother, who had been baby-sitting the various children of

28                                          - 5 -

1  Lawson's party that evening, had returned  with the children.  (Answer, Ex. C, p.73.)
2  When she turned around and went back to the car, her friends looked scared, and told
3  her that Petitioner had a machine gun.  (Answer, Ex. C, p.73.)  Lawson saw Petitioner
4  inside the car, with the door open, putting a clip in the bottom of the gun.  (Answer, Ex.
5  C, p.74.)  Lawson pleaded with Pintado and the victim to calm Petitioner down and to
6  keep Petitioner out of her apartment where the children were.  (Answer, Ex. C, p.74,76.)
7  The victim grabbed Petitioner by the arm, and was trying to grab the gun.  (Answer, Ex.
8  C, p.78.)  Petitioner pointed the gun at the victim.  (Answer, Ex. C, p.80.)  Pintado
9  pulled at Petitioner, and finally the confrontation broke up, and Pintado and Petitioner
10  walked toward the car.  (Answer, Ex. C, p.81.)  Petitioner drove the car, Pintado got up
11  front, and the victim jumped into the car as it was moving through the parking lot.
12  (Answer, Ex. C, p.81-82.)  Lawson saw the car leave the parking lot and travel south
13  on Craycroft towards Golf Links, opposite the direction from which they arrived.
14  (Answer, Ex. C, p.86-87.)  Five or six days later, Lawson saw the victims picture on a
15  poster at The Stop and at some point called the 88-CRIME number to report what had
16  happened.  (Answer, Ex. C, p.91-94.)  Lawson received $1,000 for her report.  (Answer,
17  Ex. C, p.129.)

18         Carmen Bushe, a probation officer in San Francisco, testified as an offer of
19  proof, on behalf of the Petitioner.  (Answer, Ex. C, p.101.)  Bushe testified that the
20  victim had been assigned to her following a conviction for assault with a deadly
21  weapon.  (Answer, Ex. C, p.102.)  Bushe agreed that the conviction was the result of
22  the victim's allegedly stabbing a woman seventeen times.  (Answer, Ex. C, p.102-103.)
23  The victim also had a conviction of possession for sale of marijuana, a misdemeanor.
24  (Answer, Ex. C, p.103.)  Ms. Bushe believed the victim to have a problem with alcohol,
25  and had not given the victim permission to travel to Tucson.  (Answer, Ex. C, p.104-
26  105.)

27

28                                              - 6 -

1      Inspector Clark of the homicide unit of the San Francisco Police Department also

2    testified as an offer of proof on behalf of Petitioner. (Answer, Ex. C, p.110.) Inspector

3    Clark testified that in addition to the two convictions, the victim had other arrests that

4    did not result in conviction. (Answer, Ex. C, p.112.)

5      The offers of proof did not sway the trial court's earlier rulings. (Answer, Ex.

6    C, p. 114.)

7      Vivian Whitted testified that on the evening of March 3, 1985, she went out with

8    her sister Carol, and her friends Cookie and Docia, and ended up at The Stop. (Answer,

9    Ex. C, p. 136-139.) Carol left with a friend before they got to The Stop, although later

10    Carol returned, and Docia left. (Answer, Ex. C, p. 141, 146.) Vivian had two drinks

11    and danced with the victim, who later introduced her to the Petitioner. (Answer, Ex.

12    C, p. 142-143.) Vivian, Carol and Cookie left with Petitioner, the victim, and another

13    person, and returned to Cookie's apartment. (Answer, Ex. C, p. 148.) At the apartment,

14    Cookie went in to check on the children, and the Petitioner began to get angry referring

15    to "these bitches" and "I'll kill these bitches" and arguing with the victim. (Answer, Ex.

16    C, p. 149-150.) Petitioner reached under his seat and pulled out a gun and loaded a clip

17    in the weapon. (Answer, Ex. C, p. 150-151.) When Cookie returned to the car, Vivian

18    told Cookie that Petitioner had a gun, and went with her sister back to her house.

19    (Answer, Ex. C, p. 153.) Vivian saw the victim standing in the way of Petitioner and

20    heard Petitioner say something to the victim like "move, I'll shoot you." (Answer, Ex.

21    C, p. 155.) Vivian did not see the Petitioner pointing a gun at the victim. (Answer, Ex.

22    C, p. 156.) Vivian locked the door to the apartment, and, later, Cookie came back and

23    said that they were gone. (Answer, Ex. C, p. 158.) After Vivian found out about the

24    victim's death, Vivian testified that Cookie told her not to mention anything about the

25    gun. (Answer, Ex. C, p. 173.)

26      Jeanne Segar testified that after arriving home from work one night in March,

27    1985, she heard gunshots and looked at her clock to see that it was twelve-twenty in the

28                      - 7 -

1   morning.  (Answer, Ex. C, p.184-185.)  Segar lived in the area of Golf Links and

2   Houghton.  (Answer, Ex. C, p.184.)  She heard three shots in succession, then two

3   more.  (Answer, Ex. C, p. 186.)

4         Barbara Arndt testified that she had known the Petitioner for about five years,

5   having been neighbors with Petitioner for about six months.  (Answer, Ex. D, p. 65.)

6   Arndt testified that on a night in March, Petitioner and Pintado came to her house and

7   left her a package containing a gun, although she didn't remember specifically which

8   of the two men handed her the gun, she did remember that it was Petitioner who asked

9   her to keep it.  (Answer, Ex. D, p. 66-67, 77-78.)  They told her they were going

10  downtown to drink and didn't want the gun with them.  (Answer, Ex. D, p. 68.)  Arndt

11  had the gun for two days, and, after she heard there might have been trouble, phoned

12  Petitioner to come pick up the gun. (Answer, Ex. D, p. 69.)  Petitioner wasn't home, but

13  Arndt spoke with Petitioner's wife, and the next day Pintado came and picked up the

14  gun.  (Answer, Ex. D, p. 69.)  Arndt initially denied having a conversation with

15  Petitioner, after his arrest, where he told her that it would be best for her not to say

16  anything about the gun.  (Answer, Ex. D, p. 70.)  Arndt did agree that she had spoken

17  with Detective Lough, and told him that Petitioner had told her it would be a good idea

18  if she didn't say anything about the gun, and that she was afraid of Petitioner.  (Answer,

19  Ex. D, p. 73, 79.)  Arndt did clarify that the reason she was afraid of getting into trouble

20  about the gun was because she was a prostitute and had already had three children

21  removed from her custody, and that she was not afraid of Petitioner.  (Answer, Ex. D,

22  p. 83.)  After her interview with the detective, she spoke on the phone with Petitioner

23  again.  (Answer, Ex. D, p. 75.)  The Petitioner asked her what she had told the

24  detective.  (Answer, Ex. D, p. 75.)

25         David Fine testified on behalf of the Petitioner.  (Answer, Ex. D, p. 90.)  After

26  Petitioner was arrested, Petitioner's wife asked Fine to see him at the jail.  (Answer, Ex.

27  D, p. 100.)  Petitioner thought that Fine already had the gun, but he did not.  (Answer,

28                                      - 8 -

1   Ex. D, p. 100.)  Petitioner told Fine that he needed to find the gun for him, and

2   afterwards, Fine asked around at work and found out that Mark Rhoudybush had the

3   weapon. (Answer, Ex. D, p. 100.)  Fine took the gun and kept it for a week, and, not

4   wanting to hand it over directly to the defense lawyers in this case, gave the gun to

5   Petitioner's wife.  (Answer, Ex. D, p. 92, 100.)  Fine described the gun as a .30 caliber

6   carbine, with a sawed off stock and barrel, with a 30-shot clip. (Answer, Ex. D, p. 91,

7   101.) When Pintado expressed concern to Fine over his involvement in the matter, Fine

8   informed Pintado that he no longer had the gun, and that he should not be talking to

9   Pintado about the case.  (Answer, Ex. D, p. 94-95.)

10       Nona Henry testified for the State.  (Answer, Ex. D, p. 107.)  Henry was a

11   bartender at The Stop, on March 3, 1985.  (Answer, Ex. D, p. 108.)  She remembered

12   that night specifically, because it was the owner's birthday.  (Answer, Ex. D, p. 108.)

13   Henry had seen the Petitioner a couple times before, and knew Petitioner was at The

14   Stop that night.  (Answer, Ex. D, p. 108-109.)  Henry saw Petitioner, and the "short

15   guy" he was with outside arguing.  (Answer, Ex. D, p. 110.)  Later, she saw them

16   outside arguing again. (Answer, Ex. D, p. 112.)  Petitioner was trying to get the guy to

17   go with him, and was holding him by the arm, and the guy was shaking his head "no."

18   (Answer, Ex. D, p. 112.)  Henry testified that although the fighting did not involve

19   weapons, Petitioner dropped a gun in the bar.  (Answer, Ex. D, p. 115.)  Later, police

20   came by with a photograph of the guy and she found out he was dead.  (Answer, Ex.D,

21   p. 113.)

22       Detective Petropoulos with the Pima County Sheriff's Department testified that

23   he was the first detective at the scene of the homicide on Monday, March 4th. (Answer,

24   Ex. D, p. 124.)  Detective Petropoulos, along with Detective Dahmer, processed the

25   scene. (Answer, Ex. D, p. 124.)  A casing and a fired bullet had already been found at

26   the scene when he arrived, and he found four more spent casings of the same type, a .30

27   caliber carbine.  (Answer, Ex. D, p. 129.)

28

1      Richard Miller, the Reverend who performed the baptism of the victim, testified

2  that the day after the baptism, he phoned the Petitioner in an attempt to obtain the name

3  of the victim's parents for purposes of the baptismal certificate. (Answer, Ex. A, p. 4-

4  6.) Petitioner informed Reverend Miller that he hadn't seen the victim since the night

5  before, but that he would be coming to the Petitioner's apartment later that afternoon

6  because they were going together to San Francisco. (Answer, Ex. A, p. 5-6.) Reverend

7  Miller testified that he stopped by the house around six o'clock in the evening, but no

8  one was there. (Answer, Ex. A, p. 6.) He called three or four times during the week, but

9  no one was home.  (Answer, Ex. A, p. 6-7.)

10      Reverend Miller, after discussing the events later with Petitioner, attempted to

11  contact a Roberto Pintado, having the belief that he would be an alibi witness to clear

12  the defendant. (Answer, Ex. A, p. 7-8.)  Reverend Miller, together with Petitioner's

13  counsel, attempted to contact Pintado.  (Answer, Ex. A, p. 7-8.)  Pintado returned

14  Reverend Miller's calls and Reverend Miller agreed to stop by his house.  (Answer, Ex.

15  A, p. 8-9) At Pintado's house, Pintado confessed to Reverend Miller that he was a

16  witness to the shooting. (Answer, Ex. A, p. 9.)  Reverend Miller suggested he call the

17  police, and Pintado, although concerned about what others in the Cuban community in

18  Tucson might do to him or his family, did so.  (Answer, Ex. A, p. 11.)

19      After the state rested, Petitioner moved for a directed verdict of acquittal, and

20  was denied. (Answer, Ex. A, p. 22-23.) Petitioner also made an offer of proof as to the

21  testimony of Justo Barriero, and two other witnesses.  Barriero was sworn in and

22  testified that on the day before the victim's baptism, the victim was at his house when

23  a man arrived and began arguing with the victim. (Answer, Ex. A, p. 28-29.) The man

24  told Barriero that the victim wouldn't return the money Barriero had given him for

25  drugs, but the drugs weren't any good. (Answer, Ex. A, p. 29.) The man and the victim

26  continued to argue, and the man took out a gun. (Answer, Ex. A, p. 29.) Barriero got

27  between them and told the man he needed to leave. (Answer, Ex. A, p. 29.) The man

28

1   left but told the victim that he was going to have to give him back the money.  (Answer,
2   Ex. A, p. 29.)  Barriero testified that he personally knew the victim to be involved in
3   selling drugs.  (Answer, Ex. A, p. 29-32.)  The trial court allowed Barriero's testimony.

4          Petitioner's counsel also made an offer of proof as to two other witnesses,
5   Roberto Benavidez and Cecelio Estudes, who would testify that Roberto Pintado was
6   involved in drug deals and had tried unsuccessfully to get them each involved as well.
7   (Answer, Ex. A, p. 36.)  Another witness, Larry Price, would testify to essentially the
8   same thing.  (Answer, Ex. A, p. 37.)  The trial court precluded these witnesses
9   testimony.

10         After Barriero took the stand, he was cross-examined regarding an interview he
11  gave to a detective after the murder.  Throughout the cross-examination, the State
12  brought out numerous instances where Barriero's testimony before the court differed or
13  was contradictory to an interview he provided in April after the murder to the State's
14  detective.  (Answer, Ex. A, p. 47.)

15         Mark Rhoudybush testified on behalf of Petitioner.  (Answer, Ex. A, p. 69.)
16  Rhoudybush testified that he knew Pintado, but not Petitioner.  (Answer, Ex. A, p. 70)
17  He testified that, the second or third week in March, Pintado came to him and asked
18  him if he would keep a gun for him.  (Answer, Ex. A, p. 70.)  Pintado agreed.  (Answer,
19  Ex. A, p. 70.)  Later, when Pintado did not return for the gun, Rhoudybush gave the gun
20  to a person he worked with, David Fine.   (Answer, Ex. A, p. 71-72.)

21         Petitioner's wife testified that on the date of the baptism, the relationship between
22  herself, Petitioner and the victim was really good.  (Answer, Ex. A, p. 77.)
23  Following the baptism, the baptismal party at a friends house, and going to the Elks
24  Club, Petitioner, his wife, Pintado, and the victim went to a bar called the "Stop."
25  (Answer, Ex. A, p 78-80.)  Petitioner drove his wife home at 10:30, stayed at her house
26  until 11:00, and then he left to go pick up the victim.  (Answer, Ex. A, p. 80-81.)

27

28                                        - 11 -

1   When the Petitioner's wife later woke up around 2:30, Petitioner was at her house
2   watching TV.  (Answer, Ex. A, p. 81.)

3          The next day, noticing the victim's absence, Petitioner's wife called the jail and
4   several hospitals to see if he was there.  (Answer, Ex. A, p. 82.)  Late Monday night,
5   Petitioner and his wife drove a car that was left at their house by the vicitm back to San
6   Francisco.  (Answer, Ex. A, p. 82-83.)  The car belonged to a friend of the victim's, and
7   the friend wanted the car back.  (Answer, Ex. A, p. 83-84.)   Petitioner and his wife
8   flew back with airline tickets paid for by Pintado.  (Answer, Ex. A, p. 84.)

9          Prior to the preliminary hearing, Pintado had an opportunity to read through the
10  police reports.  (Answer, Ex. A, p. 87-89.)  Pintado read the reports at Petitioner's
11  house, and, after he finished reading them stated he was "going to clear himself."
12  (Answer, Ex. A, p. 88.)

13         Petitioner's wife testified that she had received a phone call from David Fine
14  about the location of the gun.  (Answer, Ex. A, p. 90.)  Fine told her he had the gun, and
15  had received it from Pintado.  (Answer, Ex. A, p. 90.)  Petitioner's wife went with her
16  sister, Rosie Moreno, to pick up the gun.  (Answer, Ex. A, p. 90.)  Instead of bringing
17  it to Petitioner's attorney, Petitioner's wife and Moreno refused to deliver it because
18  there was a security guard standing outside the building.  (Answer, Ex. A, p. 90.)
19  Moreno then got rid of the gun.  (Answer, Ex. A, p. 91.)

20         Moreno testified that she knew Petitioner's attorney's really needed the gun, but
21  after the security guard incident, she never brought them the gun, throwing it away,
22  instead, at the city dump.  (Answer, Ex. A, p. 110-111.)  More than a month later,
23  investigators were unable to recover the gun from the dump.  (Answer, Ex. A, p. 118.)
24  Moreno testified that she used to buy drugs from Pintado, and the victim used to sell
25  drugs for Pintado. (Answer, Ex. A., p. 130-131.)

26         Petitioner testified that after the baptism, he went with the victim and Pintado
27  to Lazaro's house for a party.  (Answer, Ex. B, p. 6.)  After the party at Lazaro's,

28                                            - 12 -

Petitioner, Pintado and the victim drove another person home, and, at Pintado's request, stopped off at Petitioner's house to drop off Pintado's car. (Answer, Ex. B, p. 7.) After that, the three went to the Elks Club. (Answer, Ex. B, p. 7.) After the Elk's club, the three went to a bar called The Stop. (Answer, Ex., B, p. 8.) Petitioner testified that at The Stop, the victim danced with his wife. (Answer, Ex. B, p. 8.) Petitioner drove his wife home at 10:20 p.m., and returned to the Stop where he had left Pintado and the victim. (Answer, Ex. B, p. 9.) Pintado was outside the bar, and asked Petitioner to take him to "Cookie's house" because Cookie had talked to him about getting some cocaine. (Answer, Ex. B, p. 10.) The victim was inside the bar with Carole Dears. (Answer, Ex. B, p. 10.) Before he left, Petitioner woke up the victim, who was sleeping at a table in the bar, and brought the victim, Carole, and another women, Vivian, along with them to Cookie's house. (Answer, Ex. B, p. 11.)

At Cookie's apartment, everyone got out of the car. (Answer, Ex. B, p. 12.) Cookie went into her apartment, and Petitioner and Pintado argued because Pintado wanted Petitioner to stay, and Petitioner wanted to leave. (Answer, Ex. B, p. 13.) Petitioner got in the car to go, backed the car up, and Pintado and the victim both got into the car, the victim riding in the back. (Answer, Ex. B, p. 14.) Pintado wanted to go to his home, and the victim wanted to go to a motel. (Answer, Ex. B, p. 15.) Petitioner drove the victim where he wanted to go, and at that point the victim asked Pintado for some cocaine. (Answer, Ex. B, p.16.) Petitioner thought this was a bad idea on the victim's part, because the business between the victim and Pintado had not been going well. (Answer, Ex. B, p. 16.)

After dropping the victim off, Petitioner drove Pintado to Pintado's house, dropped him off, and went home. (Answer, Ex. B, p.17.) Petitioner arrived at his home before midnight, and stayed up and had a beer and watched a movie. (Answer, Ex. B, p.18.)

- 13 -

1    The next day Petitioner received a phone call from a man asking for the victim.
2    (Answer, Ex. B, p.19.)  The man said something to the Petitioner about a woman who
3    was worried because she had lent the victim a car.  (Answer, Ex B, p. 19.)  Petitioner
4    didn't worry over the absence of the victim until around six o'clock in the evening, when
5    he became convinced that the victim was probably in jail.  (Answer, Ex B, p. 20.)  By
6    seven-thirty or eight o' clock, Petitioner began driving around looking for the victim.
7    (Answer, Ex B, p. 22.)

8        Petitioner decided to return the victim's car to San Francisco, because, after
9    discussions with a man in San Francisco, he understood that the owner of the car was
10   very worried about the car, and he felt it was his duty to return it.  (Answer, Ex B, p.
11   22-23.)  After stopping first at Lazaro's house, and then at Pintado's house, Petitioner
12   left for San Francisco.  (Answer, Ex B, p. 23-24.)

13       While in San Francisco, Petitioner received news through his wife that the victim
14   was dead.  (Answer, Ex B, p. 26.)  Petitioner called Pintado to verify the news.
15   (Answer, Ex B, p. 26.)  Pintado confirmed the victim's death, and wired Petitioner six
16   hundred dollars in order for Petitioner to bring some drugs back to Tucson from San
17   Francisco.  (Answer, Ex B, p. 27.)  Petitioner used the money to fly back to Tucson.
18   (Answer, Ex B, p. 27.)

19       Back in Tucson, Petitioner accused Pintado of killing the victim.  (Answer, Ex
20   B, p. 28.)  Pintado denied killing the victim, and Petitioner believed him.  (Answer, Ex
21   B, p. 29.)  Over the next several days Petitioner attempted to obtain information about
22   what had happened to the victim.  (Answer, Ex B, p. 29.)  Petitioner was interviewed
23   by Detective Pantke at his house, with his wife acting as interpreter, and he did not tell
24   the detective about going to Cookie's apartment.  (Answer, Ex B, p. 31.) Petitioner also
25   denied driving the victim's car to San Francisco, and told the detective that the victim
26   had already left by the time he got to the bar.  (Answer, Ex B, p. 35.)  Petitioner also
27   admitted lying to Detective Pantke about the $600 being wired to him in San Francisco,

28

and lying to Detective Pantke that the victim was not involved in drugs. (Answer, Ex. B, p. 46, 77.)

Following closing arguments, the jury was instructed and retired to deliberate. After deliberations, the jury found Petitioner guilty of first-degree murder as charged in the information, and found the offense to be of a dangerous nature involving the use or exhibition of a deadly weapon or dangerous instrument, to-wit: A gun. (Answer, Ex. E, p. 92.)

*Appeal*

Petitioner, through counsel, presented three issues in his direct appeal to the Supreme Court. (Answer, Ex. G.) The issues in the appeal were: (1) Was the Petitioner denied his right to effective assistance of counsel because his trial attorney failed to raise the issues of self-defense and diminished capacity? (2) Did the trial court improperly exclude evidence regarding the victim's violent past? (3) Alternatively, was trial counsel ineffective for allowing the trial court to preclude evidence concerning the victim's history for violence and drug use? (Answer, Ex. G.)

On March 4, 1987, the Supreme Court affirmed the conviction. (Answer, Ex. H.) A Motion for Rehearing in Pro Se to the Supreme Court was denied on May 13, 1987. (Answer, Ex. H.)

*First Petition for Post-Conviction Relief*

On August 25, 1988, Petitioner filed a Petition for Post-Conviction Relief in the trial court. (Answer, Ex. I.) Petitioner raised ten claims in his petition, all claims of ineffective assistance of counsel. (Answer, Ex. I.) In a supplement submitted by appointed counsel, Petitioner argued that he was eligible for relief because of ineffective assistance of counsel and because his rights to due process were violated. (Answer, Ex. J.) The trial court denied the petition, finding that all issues raised in the petition could have been or had been raised on appeal. (Answer, Ex. K.)

1   Petitioner filed a motion for rehearing, which was denied by the trial court on

2   June 27, 1989.  (Answer, Ex. L, M.)  On June 29, 1989, Petitioner filed a Petition for

3   Review of Post Conviction Relief.  (Answer, Ex. N.)  The Petition for Review was

4   denied by the Arizona Supreme Court on April 18, 1990.  (Answer, Ex. O.)

5   ***First Federal Habeas***

6   On September 14, 1990, Petitioner filed a pro se habeas in District Court

7   raising four claims of ineffective assistance of trial counsel: (1) that trial counsel

8   failed to object to an erroneous jury instruction on premeditation; (2) that trial

9   counsel allowed the prosecutor to present a "coerced witness [Barbara Arndt];" (3)

10   that trial counsel allowed the State to present perjured testimony by Pintado; and (4)

11   that his trial counsel did not adequately cross-examine the State's witnesses to reveal

12   inconsistencies or bring forth important evidence on Petitioner's behalf.  The District

13   Court found that only the first claim had been properly exhausted, and dismissed the

14   petition, without prejudice, as a mixed petition.

15   ***Second Federal Habeas***

16   On September 19, 1991, Petitioner filed a pro se habeas in District Court raising

17   three issues: (1) the trial court committed fundamental error in instructing the jurors on

18   first- and second-degree murder; (2) trial counsel was ineffective by failing to object

19   to the trial court's alleged erroneous jury instructions; and (3) appellate counsel was

20   ineffective by failing to raise the jury instruction issue on appeal. (Answer, Ex. P.) The

21   district court found that the Petitioner had procedurally defaulted his claims by failing

22   to raise them on direct appeal or in the post-conviction relief process.  (Answer, Ex. P.)

23   The district court further found that the Petitioner had failed to demonstrate cause for

24   the default.  (Answer, Ex. P.)

25

26

27

28                                          - 16 -

1    ***First Federal Appeal***

2         The Ninth Circuit affirmed the district court's finding that Petitioner had

3    procedurally defaulted his claims of ineffective assistance of trial counsel and trial court

4    error in jury instructions.  (Answer, Ex. P.)

5         The Ninth Circuit reversed the district court's finding that Petitioner procedurally

6    defaulted his claim of ineffective assistance of appellate counsel, and remanded the

7    claim to the district court to determine the merits of the claim.  (Answer, Ex. P.)

8         On remand, the district court dismissed the habeas petition, without prejudice,

9    so that Petitioner could pursue any available state remedies.

10   ***Second Petition for Post-Conviction Relief***

11        On July 31, 1995, Petitioner filed a second notice of post conviction relief.

12   (Answer, Ex. Q.) On November 12, 1997, Petitioner, through counsel, filed the second

13   petition, submitting new claims of: (1) new evidence that would demonstrate that

14   Pintado had threatened Lawson to fabricate her testimony; (2) a change in the law that

15   would establish that the jury was improperly instructed on premedition.  Petitioner

16   reasserted his claims that (1) trial counsel was ineffective for failing to object and

17   preserve the record regarding the faulty jury instructions on premedition and first

18   versus second degree murder; (2) ineffective assistance of trial and appellate counsel

19   for the fault required to overcome preclusion of his claim of ineffective trial counsel,

20   and (3) fundamental error by the court in the faulty jury instructions.  (Answer, Ex. R.)

21   Petitioner also reasserted his prior post-conviction petition issues and asserted issues

22   in a supplemental pro se petition.

23        The trial court denied the claim of new evidence, finding that the affidavit relied

24   upon to support the claim was double hearsay.  (Answer, Ex. S, p. 4.)   The court also

25   found that, while the affidavit might have been admissible as a prior statement by a

26   witness, the rules do not allow newly discovered evidence for impeachment purposes,

27   unless the evidence undermines the testimony which was of critical significance at trial

28

1   such that the evidence probably would have changed the verdict or sentence. (Answer,

2   Ex. S, p. 4.)   The trial court found that even if all of Lawson's testimony was

3   disregarded, it would not have changed the verdict.  (Answer, Ex. S, p. 4.)

4        The trial court denied the change in law claim, distinguishing the facts of the

5   present case from the facts of the case relied upon by Petitioner for his claim.  (Answer,

6   Ex. S, p. 6-9.)

7        The trial court again found the issue of erroneous jury instructions regarding

8   second degree murder, the ineffective assistance of trial counsel in failing to object to

9   the instruction and appellate counsel for failing to raise the issue on direct appeal,

10  precluded.  (Answer, Ex. 9.)  The trial court, however, "in an effort to put this matter

11  to rest" ruled on the merits of the issue.  (Answer, Ex. S, p. 9.)  The trial court found

12  that Petitioner's assertion that the trial court should have instructed that second degree

13  murder is a killing "without premeditation" to be logically inconsistent, requiring the

14  state to prove the lack of premeditation, and; in this case, made clear by the language

15  of the first and second degree murder instructions combined.  (Answer, Ex. 10.)

16       Petitioner filed a petition for review to the Arizona Court of Appeals raising

17  three issues: (1) Is the affidavit of Lawson's brother newly discovered evidence, and if

18  such facts were introduced at Petitioner's trial would it have probably changed the

19  verdict?  (2) Is the Court of Appeals ruling clarifying the premeditation instruction in

20  first degree murder cases a significant change in law, that if determined to apply to the

21  Petitioner's case could probably overturn his conviction? and (3) Did the trial court

22  commit fundamental error in failing to properly instruct the jury on the elements of first

23  degree murder and second degree murder and denied the defendant a fair trial in

24  violation of the Fourteenth Amendment of the United States Constitution in that the

25  instructions relieved the State of the burden of proving every element of the offense

26  beyond a reasonable doubt?

27

28

1    The court of appeals denied review, and, after the Arizona Supreme Court also

2 denied review (Answer, Ex. W), the mandate affirming the conviction issued on June

3 9, 2000.  (Answer, Ex. U.)

4 **_Third Petition for Post Conviction Relief_**

5    On May 25, 2000, Petitioner filed a Writ of Habeas Corpus in the trial court

6 claiming manifest injustice and actual innocence, specifically (1) the State knowingly

7 used perjury to obtain a conviction against the Petitioner; (2) the State denied the

8 Petitioner the right to confront state witnesses and to present witness in Petitioner's

9 behalf; (3) the State used a false witness against the Petitioner; (4) the State used a

10 coerced witness to falsely accuse Petitioner; (5) the State used false testimony in the

11 opening and closing arguments; and (6) the agreement between the State and the State's

12 key witnesses violated the Petitioner's due process.  (Answer, Ex. X.)

13    The trial court treated the petition as a petition for post conviction relief and

14 denied the petition for failure to file a notice of post conviction relief, and, finding that

15 even if a proper notice had been filed, the exceptions for filing an untimely notice of

16 post conviction relief, pursuant to Rules 32.1(d) (e) (f) or (g)  had not been met in this

17 case.  (Answer, Ex. Y.)

18    The court of appeals denied a petition for review, finding that the trial court did

19 not abuse its discretions and that the issues were precluded for failure to raise them on

20 appeal.  (Answer, Ex. Z.)  The Arizona Supreme Court denied review on December 7,

21 2000.  (Answer, Ex. AA)

22 **_Third Federal Habeas_**

23    Petitioner filed a petition for habeas corpus in the District Court on May 16,

24 2001.  The petition raises the following four claims: (1) that federal due process was

25 violated because the trial court gave "fundamentally flawed instructions on first and

26 second degree murder" and that appellate counsel was ineffective in not challenging

27 them on appeal" (2) that federal due process was violated because Lawson perjured

28
- 19 -

herself at trial after Pintado had threatened her; (3) that federal due process was violated because the prosecutor used perjured testimony and vouched for witnesses; and (4) that federal due process was violated by the State's plea agreement with Pintado.

Respondents filed an answer to the Petition on November 5, 2001.  On July 30, 2002, this Court stayed Petitioner's case to allow Petitioner to return to state court to exhaust a claim that Petitioner argued was made available due to a significant change in the law.  The state trial court denied relief on Petitioner's claim on May 15, 2003. The court of appeals granted review, but denied relief on July 9, 2004, and denied a *pro se* motion for reconsideration on August 12, 2004.  A petition for review to the Arizona Supreme Court was filed and was denied on January 4, 2005.  The Arizona Court of Appeals issued the mandate on February 10, 2005, and this Court lifted the stay in this case on April 20, 2005, and set a briefing schedule for the newly exhausted state claim.

Petitioner requested that the stay continue because Petitioner was seeking a writ of certiorari in the United States Supreme Court.  Petitioner also argued that the provisions of the AEDPA should not apply to the newly exhausted claim.  This Court denied the request to continue the stay, and granted the Petitioner's request to reconsider application of the AEDPA, allowing both parties to fully brief the issue.

Petitioner submitted a supplemental briefing on May 20, 2005, and Respondents filled a response in opposition, further arguing that Petitioner's claim should not be considered because Petitioner had made no motion to supplement or amend the original Petitioner for Writ of Habeas Corpus.  This Court acknowledged the response, and allowed Petitioner additional time to file a motion to amend or supplement the petition. Petitioner filed a motion for leave to amend or supplement the petition on July 11, 2005. Respondents did not file an opposition to the motion. In a separate order, this Court granted Petitioner's request to amend the petition.

**DISCUSSION**

**Standard of Review**

*Do the provisions of the AEDPA govern this case?*

The present petition was filed on May 16, 2001.  The AEDPA was enacted on April 23, 1996.  Petitioner argues that this petition was originally filed in 1991, before the enactment of the AEDPA, and was erroneously dismissed by Judge Roll in 1995. Erroneous or not, Petitioner did not appeal the dismissal of his second federal habeas, CV 91-521-TUC-JMR.  A petition does not relate back to an earlier petition which is dismissed in order to allow a petitioner to exhaust state remedies.  *Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000) (citing *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000).  There is no petition to which the new petition can relate back or amend. *See Green*, 223 F.3d at 1003 (citing *Henry v. Lungren*, 164 F.3d 1240, 1241 (9th Cir. 1999)).  *See also Dils v. Small*, 260 F.3d 984 (9th Cir. 2001).  Furthermore, although an exception was carved out by the Ninth Circuit in *Anthony v. Cambra*, 236 F.3d 568 (9th Cir. 2000), for cases in which a petitioner does not accept dismissal of a mixed petition and elects to resubmit a petition with only exhausted claims, the exception does not apply in this case because Petitioner accepted the dismissal of his petition and returned to file a new petition after exhausting state remedies.  Furthermore, it is not enough for petitioner to now argue that the District Court erred, failure to appeal the District Court's decision prevents this Court from considering it now.  *See Henderson v. Lampert*, 396 F.3d 1049 (9th Cir. 2005).   Accordingly, the Magistrate Judge recommends that the provisions of the AEDPA apply to all aspects of this petition.

**Standard of Review**

The writ of habeas corpus is available to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The District Courts's standard of review is described as follows:

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Timeliness**

A one year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  28 U.S.C. § 2244(d)(1).

**Exhaustion**

An application for writ of habeas corpus shall not be granted unless the applicant has exhausted the remedies available in the courts of the State, there is an absence of available State corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  28 U.S.C. § 2254(b)(1).  This requirement of exhaustion is designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512 (1971).

Generally, there are two methods by which a petitioner may satisfy the exhaustion requirement.  First, a petitioner may actually exhaust his claims by providing the state court with an opportunity to review the facts and legal theories in a procedurally appropriate manner.  In order to actually exhaust his or her claims, a

petitioner must fairly present the federal claims to the state courts; this means that a petitioner is required to present the state courts with the same claim he urges upon the federal courts. *Id.*, 404 U.S. at 275-276, 92 S.Ct. at 512. A state court must be alerted to the fact that a petitioner is asserting a claim under the United States Constitution. *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888 (1995). It is not enough to present the state court with only the facts necessary to state a claim for relief, nor to make a general appeal to a constitutional guarantee as broad as due process. *Gray v. Netherland*, 518 U.S. 152, 163, 117 S.Ct. 2074, 2081 (1996). Mere similarity between claims of state and federal error is also insufficient to establish exhaustion. *Shumway v. Payne*, 223 F.3d 982, 988 (9th Cir. 2000) (citing *Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)). A petitioner must make the federal basis of a claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident," or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds. *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir.2001) (quoting *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999)).

A second form of exhaustion, "technical exhaustion" can be demonstrated by showing either that a state court found a claim defaulted on procedural grounds, or, if the claim was never presented in any forum, that no state remedies remain available to the petitioner. Because the exhaustion requirement refers only to remedies still available at the time of the federal petition, if a petitioner failed to present his claims in state court and can no longer raise them through any state procedure, state remedies are no longer available, and are thus exhausted. *Gray*, 518 U.S. at 161-62, 117 S.Ct. at 2080 (1996); *Franklin v. Johnson*, 290 F.3d 1223, 1231 (9th Cir. 2002) (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28, 102 S.Ct. 1558 (1982)); *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728 (1999). The procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction

and sentence, and thus prevents federal habeas corpus review of the claim, unless the petitioner can demonstrate cause and prejudice for failing to raise the claims in earlier proceedings. *Gray*, 518 U.S. at 162, 116 S.Ct. at 2080 (citations omitted).

If a claim has never been presented to the state court, a federal habeas court may determine whether state remedies remain available[1]. *See Harris v. Reed*, 489 U.S. 255, 269-70 (1989); *Teague v. Lane*, 489 U.S. 288, 298-99.

Rule 32.1 of the Arizona Rules of Criminal Procedure allows a defendant to seek post-conviction relief on the ground that his conviction was in violation of the Constitution of the United States. Ariz. R. Crim. P. 32.1(a). Arizona Rule of Criminal Procedure 32, however, governs when a petitioner may seek relief in post-conviction proceedings and raise federal constitutional challenges to their convictions or sentences in state court. Under Rule 32.2, relief is barred on any claim which could have been raised in a prior Rule 32 petition for post-conviction relief, with the exception of certain claims which fall under sub-sections (d) through (h) of Rule 32.1, and which were justifiably omitted from a prior petition.

Furthermore, Rule 32.4 (a) requires that a petition for post-conviction relief must be filed within 90 days of the entry of judgment and sentence or 30 days after the issuance of the order and mandate in the direct appeal, whichever is the later. See Ariz. R. Crim. P. 32.4(a). Again, the exceptions to this requirement are claims asserted under subsections (d) through (h) of Rule 32.1. Ariz. R. Crim. P. 32.4(a).

---

[1] Although the Ninth Circuit has recently suggested that under Rule 32.2(a)(3), there are exceptions to the rule that a District Court can make such a determination for claims which require a knowing, voluntary, and intelligent waiver, *see Cassett*, v. Stewart, 406 F.3d 614, (9th Cir. 2005), this Court does not address such waiver because it has not been affirmatively raised by the petitioner. *See Beaty v. Stewart*, 303 F.3d 975, 987 & n.5 (9th Cir. 2002).

Thus, in situations where a petitioner might otherwise attempt to revive an unexhausted federal claim in state court, and the state court might invoke the procedural bars of Rule 32.2 and 32.4(a), Arizona Rules of Criminal Procedure, in rejecting such an attempt, there is an adequate and independent state ground barring Petitioner from raising these claims in state court proceedings thereby creating a procedural default for purposes of federal habeas review.

## Procedural Default

A state court's adequate and independent finding of procedural default will bar federal habeas review of a federal claim unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto," or demonstrate that failure to consider the federal claim will result in a "'fundamental miscarriage of justice.'" *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038 (1989).  A procedural default does not bar consideration of a federal claim, however, unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar.  *Harris,* 489 U.S. at 263, 109 S.Ct. at 1043, quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638 (1985).

## Cause and Prejudice

A petitioner may be relieved from a procedural default on a showing of cause and prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 85-87, 97 S.Ct. 2497 (1977).  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

**ANALYSIS**

**Timeliness**

Respondents do not contest the timeliness of the habeas petition.  A review of the petition suggests that it is timely.  Accordingly, this Court finds that the Petition is timely.

**Ground One**

Petitioner argues that the state conviction violates his constitutional right to due process of law because appellate counsel failed to:   (1) argue the jury instructions as flawed; and (2) failed to argue the trial counsel's failure to object to either the instructions or the prosecutor's arguments on the flawed jury instructions.

Respondents construed this as an argument having three sub-claims: (1) that the trial court gave flawed instructions on first and second-degree murder; (2) that trial counsel was ineffective for not objecting to these instructions; and (3) that appellate counsel was ineffective for not making an issue of these instructions on appeal. Respondents then countered these sub-claims asserting that: (1) the first claim is not specific enough to merit review; (2) two of the sub-claims are procedurally barred; (3) claim one was not raised as a federal claim ; (4)  all three sub-claims are barred under *Teague*; and (5) Petitioner cannot show ineffective assistance of appellate counsel because the underlying claim is meritless.

This Court does not construe Petitioner's argument as having three sub-claims. From this Court's review of the Petition, it appears that the Petitioner is only claiming ineffective assistance of appellate counsel.  This claim was remanded by the Ninth Circuit to the district court for a determination of this claim, and is properly before the Court, as noted below.  To the extent that the District Court finds that there are three sub-claims presented as construed by Respondents, this Court agrees that the first two such sub-claims would be procedurally defaulted.  This alternative analysis follows.

1  *Procedural Bar*

2     Petitioner first raised these issues, through counsel, in a supplement to his *pro*

3  *se* Rule 32 motion[2].  The trial court found, as a matter of fact, that all issues raised by

4  the defendant on Rule 32 could have been or had been raised on appeal.  (Answer,

5  Exhibit K.)  The Arizona Supreme Court denied a petition for review without an

6  opinion.  (Answer, Ex. O.)  The district court found that Petitioner had procedurally

7  defaulted his claims by failing to raise them on direct appeal or in the post-conviction

8  relief petition.  The district court further found that Petitioner had failed to demonstrate

9  cause for his default.

10    The Ninth Circuit reversed in part, finding that the district court clearly erred

11  because the claim that his counsel was ineffective for failing to raise the issue on direct

12  appeal was raised in Petitioner's supplemental petition and in the motion for a rehearing,

13  and, logically, Petitioner could not have raised such a claim on appeal.  The Ninth

14  Circuit remanded to the district court for a determination of the merits of this claim.

15    The Ninth Circuit further found that Petitioner had procedurally defaulted his

16  claim that trial counsel was ineffective for failing to object to the jury instructions

17  because the trial court denied relief finding that Petitioner should have raised the claim

18  on direct appeal, and such decision was "clearly and expressly" based on a state

19  procedural bar.

20    Similarly, the Ninth Circuit found that Petitioner had procedurally defaulted his

21  claim that the trial court committed fundamental error in instructing the jurors on first-

22  and second- degree murder because, again, the trial court's decision was "clearly and

23  expressly" based on a state procedural bar.

24

25     [2]     While the exhibit to the supplemental brief is not included in this

26     record, the outline of Petitioner's argument was summarized by the

       Ninth Circuit in its unreported opinion, *Santana v. Schriner*, 42 F.3d

27     1402 (9th Cir. 1994) (Answer, Exhibit P).

28

1    The Ninth Circuit found that Petitioner had failed to demonstrate cause for the
2  procedural default.

3    The "law of the case" doctrine requires courts to follow the decision of an
4  appellate court on a legal issue in all subsequent proceedings in the same case unless:
5  (1) the decision is clearly erroneous and its enforcement would work a manifest
6  injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3)
7  substantially different evidence was adduced at a subsequent trial. *In re Rainbow*
8  *Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996) (citing *Herrington v. County of*
9  *Sonoma*, 12 F.3d 901, 904 (9th Cir.1993)).

10    This Court finds that no exceptions to the "law of the case" rule have been
11  demonstrated in this case.

12    Thus, this Court recommends that should the District Court construe Ground
13  One of the Petition as having three sub-claims, as presented by Respondents, that the
14  District Court find that Petitioner has procedurally defaulted the first two sub-claims
15  in Ground One of the Petition, (error by the trial court and ineffective assistance of trial
16  counsel) having been previously found to be procedurally defaulted by the Ninth Circuit
17  and no new factual or legal issues regarding these claims demonstrated by Petitioner.
18  *Failure to raise Claim One as a federal claim in state court.*

19    Respondents argue that Petitioner failed to raise the underlying issue of error
20  regarding the instructions as a federal claim in state court.  As noted above, a petitioner
21  must make the federal basis of a claim explicit either by citing federal law or the
22  decisions of federal courts.  *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), *as*
23  *modified by* 247 F.3d 904 (9th Cir.2001),quoting *Gatlin v. Madding*, 189 F.3d 882, 889
24  (9th Cir. 1999).  Respondents claim that Petitioner failed to raise the issue of the
25  erroneous jury instructions as a federal claim in his state proceedings.  Petitioner,
26  however, argued in his *pro se* petition for review of his second petition for post-
27  conviction relief to the appellate court that the trial court's failure to instruct the jury

28

that any second degree murder is a killing without premeditation denied him a fair trial "in violation of the Fourteenth Amendment to the United States Constitution, and that his trial counsel was ineffective for failing to object to the instruction and his appellate counsel was ineffective for failing to raise this issue on direct appeal in violation of the Sixth Amendment of the United States Constitution." (Answer, Exhibit T.) Thus, both the underlying claim that the jury instructions were erroneous, and the reliant claim, that counsel was ineffective for failing to raise this issue, were raised in state court as federal issues.

*Teague Analysis*

Respondents argue that, under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060 (1989), Petitioner cannot benefit from a rule that is adopted after his conviction becomes final. Respondent argues that, in this case, it would be a new rule to declare on federal habeas review that it is a due process violation for a State not to draw a "meaningful distinction" between first and second-degree murder.

A case announces a new rule if the result was not dictated by precedent at the time the defendant's conviction became final, or, in other words, the decision announces a rule that "breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 109 S.Ct. at 1070, 489 U.S. at 301 (citations omitted).

Petitioner argued in his second federal habeas petition that the trial court committed fundamental error by failing to instruct the jury that second degree murder is a killing without premeditation.[3] Petitioner also argued that the trial court's error was

---

[3]       Because the Ninth Circuit remanded the ineffective assistance claim to the district court for review, and respondents have addressed the issues as framed in the Petitioners 1991 federal habeas petition, and because *pro se* petitioners are to be allowed a certain amount of liberality in the construction of their documents, this Court considers Petitioner's first claim as presented in the present Petition and as argued in the second

1  further compounded because the jury instructions minimized the "reflective" nature of

2  the intent or knowledge which "premeditation" requires.

3      A *Teague* analysis, however, is not appropriate in this case.  Petitioner now

4  raises his claim as an ineffective counsel claim under the Sixth Amendment and the

5  Supreme Court's test for ineffective assistance formulated in *Strickland v. Washington*,

6  466 U.S. 668, 104 S.Ct. 2052 (1984).  While the "prejudice" component of the

7  *Strickland* test focuses on the question whether counsel's deficient performance renders

8  the result of the trial unreliable or the proceeding fundamentally unfair by depriving a

9  defendant of a substantive or procedural right to which the defendant is entitled under

10  the law, a contemporary assessment of counsel's conduct is used when determining the

11  deficient performance component of the *Strickland* test.  *See Lockhart v. Fretwell*, 506

12  U.S. 364, 113 S.Ct. 838 (1993).  Thus, this Court is bound to determine whether the

13  state court erred in rejecting Petitioner's ineffective assistance claim by assessing

14  counsel's performance based on the state of the law at the time of counsel's

15  performance.  Thus, Petitioner did not, and could not, argue for a new rule through his

16  ineffective assistance of counsel claim, and a *Teague* analysis is not suitable here.

17  Accordingly, this Court addresses Petitioner's first claim on the merits.

18  *Ineffective Assistance of Trial Counsel*

19      Petitioner argues that the trial court erred by failing to instruct the jury that

20  second-degree murder is a killing without premeditation, and counsel failed to raise this

21  issue on appeal.

22      The jury was instructed as to first and second degree murder, and premeditation,

23  as follows:

24          The crime of first-degree murder requires proof of the following three

25      things:

26  _____

27          federal habeas petition, CV 91-521-TUC JMR.

28                              - 30 -

Number One.  The defendant caused the death of another person; and

Number Two.  The defendant intended or knew that he would cause the death of another person; and

Number Three.  The defendant acted with premeditation.

Premeditation means:

Number One.  That person either intends or knows that his conduct will result in death to another person; and

Number Two.  His intent or knowledge exists before the killing long enough to permit reflection.

An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.  But no appreciable length of time must elapse between the formation of the intent to kill and the act.  They may be as instantaneous as successive thoughts of the mind.

The crime of first-degree murder includes the less serious crime of second-degree murder.  If you do not find beyond a reasonable doubt that the defendant is guilty of first-degree murder, you may consider whether or not the defendant is guilty of second-degree murder.

The crime of second-degree murder requires proof that:

Number One.  The defendant intentionally caused the death of another person; or

Number Two.  The defendant caused the death of another person by conduct which he knew would cause death or serious physical injury; or

Number Three.  Under circumstances manifesting extreme indifference to human life, such person engages in conduct which creates a grave risk of death and thereby causes the death of another person.

If you determine that the defendant is guilty of either first-degree murder or second-degree murder, but you have a reasonable doubt as to which it is, you must find the defendant guilty of second-degree murder.

(Answer, Ex. E, p. 82-83)

The trial court rejected Petitioner's argument, analyzing the requisite claim, that the trial court erred in the first instance, finding that (1) interpreting the statues and caselaw as the petitioner requests would create a logical inconsistency, and (2) factually, the distinction in these instructions between first and second degree murder was clear.  Implicit in the state court's opinion is the finding that counsel could not be

ineffective for failing to argue such error on appeal, if the trial court did not err in the first instance. The appellate court adopted the trial court's findings on appeal under *State v. Whipple*, 177 Ariz. 272, 866 P.2d 1358 (App. 1993), and the Arizona Supreme Court denied review.

Petitioner is entitled to relief if the state court's decision rejecting his ineffective-assistance claim was either "contrary to, or involved an unreasonable application of," established law. *Williams v. Taylor*, 529 U.S. 362, 391 (2000). Neither the Court of Appeals nor the Supreme Court of Arizona articulated a rationale for affirming the trial court's decision, thus, this Court, adopts the "look through" approach to determining whether the state court applied the correct federal law in a reasonable manner. This approach maintains that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appear[s] to rest primarily upon federal law,"[] we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991).

The established law governing the merits of an ineffective assistance of counsel claim is expressed in *Strickland v. Washington*, 466 U.S. 668 (1984). The general standard for attorney performance is that of "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test requires Petitioner establish deficient performance by counsel and prejudice resulting from that performance to obtain relief. *See Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002), *amended,* 311 F.3d 928.

In reviewing claims of ineffective assistance of appellate counsel, the two pronged standard applies that was set forth in *Strickland*. *Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Petitioner must show that counsel's advice fell below an

1  objective standard of reasonableness, and that there is a reasonable probability that, but
2  for counsel's unprofessional errors, he would have prevailed on appeal. *Miller v. Keeney*
3  882 F.2d 1428, 1434 (9th Cir. 1989) (citing *Strickland* 466 U.S. at 694, 104 S.Ct. at
4  2068; *United States v. Birtle*, 792 F.2d 846, 849, FN9 (9th Cir.1986)).

5      The state trial court made a reasonable determination of the law and facts.
6  Looking at the trial instructions as a whole, it is clear that the jury could distinguish
7  between the elements of first and second-degree murder.  Furthermore, it was clear that
8  the element of premeditation was a requisite element of a finding of first degree murder,
9  and that, if there was a reasonable doubt as to whether it was first or second degree
10 murder, the jury was to make a finding of second degree murder.  Thus, the trial court
11 found the argument meritless, and, failure to raise a meritless argument does not
12 constitute ineffective assistance.  *See Boag v. Raines*, 769 F.2d 1341 (9th Cir. 1985)
13 (citing *Cooper v. Fitzharris*, 551 F.2d 1162, 1166 (9th Cir. 1977)).

14      Both Petitioner and Respondents make much of Petitioner's argument that, in
15 addition to the failure to instruct that second-degree murder is a killing without
16 premeditation, that the definition of premeditation was erroneous, resulting in the
17 effects of the error being compounded.  This, however, did not become part of
18 Petitioner's ineffective assistance claim until he combined this issue with his
19 ineffectiveness claim in his federal habeas.  Prior to that, he had argued to the state
20 courts that the jury instruction on premeditation constituted reversible error due to a
21 significant change in the law.  This argument, standing on its own, was rejected by the
22 state courts.

23      This Court finds that Petitioner's argument as to the definition of premeditation
24 was unexhausted as an ineffective assistance of counsel claim.  Petitioner would now
25 be barred from returning to state court to raise this issue pursuant to Arizona Rules of
26 Criminal Procedure, Rules 32.2(a)(3), 32.2(b) and 32.4(a).  Thus, the claim is
27 technically exhausted but procedurally defaulted, and the District Court should not

28                                    - 33 -

1  consider the claim on the merits absent a showing of cause and prejudice, or a
2  fundamental miscarriage of justice.

3        Because this issue was not raised by Respondents as a defense regarding this
4  issue, however, Petitioner has not had an opportunity to attempt to persuade this Court
5  of the cause for the default and any prejudice that my have flowed from the alleged
6  constitutional deprivation, nor has he been made aware that he could present facts to
7  demonstrate that he has suffered a miscarriage of justice.

8        Accordingly, this Court now informs Petitioner that pursuant to this Court's
9  recommendation to the District Court that this claim be dismissed as procedurally
10 defaulted, Petitioner is entitled to submit any facts or argument to the District Court to
11 demonstrate cause for the default and any prejudice that may have flowed from the
12 alleged constitutional deprivation, and/or present facts to demonstrate that he has
13 suffered a miscarriage of justice. Petitioner may argue cause and prejudice or
14 fundamental miscarriage of justice to the District Court in any objections raised to this
15 report and recommendation.

16       Alternatively, having found that counsel's performance was not deficient, under
17 the first prong of *Strickland*, as to the absence of a "lack of premeditation" instruction,
18 this Court, would also recommend a finding that counsel's performance was not
19 deficient for failing to raise an issue that Petitioner himself asserted in his Rule 32
20 petition and petition for review to the state appellate court  is based on a significant
21 change in the law.  As Respondents amply argue, at the time of Petitioner's appeal, this
22 issue was not the "dead bang winner" required to demonstrate that counsel's failure to
23 raise the issue on appeal was ineffective.

24 *Recommendation: Ground One*

25       To clarify, this Court recommends that the District Court, after its independent
26 review, find that the only issue properly before the court is the claim that Petitioner's
27 appellate counsel was ineffective for failing to argue that second-degree murder should

28

have been defined as a killing "without premeditation."  This Court recommends dismissing this claim as the state court made a reasonable determination of the law and facts, finding that the argument was meritless.  Failure to raise a meritless argument does not constitute ineffective assistance.  This Court further recommends a finding that Petitioner has defaulted his claim that appellate counsel was ineffective for failing to object to the jury instructions as to premeditation.

In the alternative, should the District Court find the claim that Petitioner's appellate counsel was ineffective for failing to argue that the definition of premeditation was erroneous fully exhausted, this Court recommends dismissing this claim as it was not the "dead-bang winner" required to meet the first prong of the *Strickland* standard.

### Ground Two

Petitioner argues that newly discovered evidence establishes that a state's witness perjured herself at trial because the state's chief witness had threatened her and her families lives in violation of Petitioner's right to due process of law under the constitution.

Respondent argues that Petitioner's second claim was not raised in the state court's as a federal constitutional claim.  Respondent is correct.  (See Answer, Ex. R, p. 9-19, Ex. T, p. 11-16, Ex. V. p. 9-13.)  Petitioner raised the claim as a claim of new evidence, arguing state law only on the issue, and the trial court analyzed the claim as such.  (See Answer, Ex. S.)

To exhaust his Arizona remedies, Petitioner needed to give the Arizona courts a "fair opportunity" to act on his federal due process claim before presenting it to the federal courts.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Peterson v. Lampert*, 319 F.3d 1153, 1155-56, 1159 (9th Cir.2003) (*en banc*).  It is not clear whether the appropriate brief to consider is the brief to the appellate court, or the brief to the Arizona Supreme Court. *See Castillo v. McFadden* 399 F.3d 993, 998 FN3 (9th Cir. 2005).  In this case, however, it is irrelevant as

1   Petitioner did not raise a federal constitutional issue as to this claim in any of his
2   petitions.

3   In order to fully exhaust his claim, Petitioner needed to apprise the state courts
4   that he was making a claim under the U.S. Constitution by describing both the operative
5   facts and the federal legal theory on which his claim is based in order to allow the state
6   courts a fair opportunity to apply controlling legal principles to the facts bearing upon
7   his constitutional claim. *See Castillo, Id.* at 999 (citations omitted). Petitioner failed
8   to fully exhaust this claim because he did not reference specific provisions of the
9   federal constitution or cite to federal or state cases involving the legal standard for a
10  federal constitutional violation. *See Castillo*, *Id*.

11  The state courts have never had an opportunity to address the legal theories
12  presented in Petitioner's federal habeas because they were not argued in petitioner's
13  state petition for post-conviction relief or subsequent petitions for review. Petitioner
14  has failed to present the issues raised in Ground Two to the state court in a manner
15  which would alert the state court to the explicit federal nature of his claim. Petitioner
16  would be barred from returning to state court to raise this claim, pursuant to Arizona
17  Rules of Criminal Procedure, Rules 32.2(a)(3), 32.2(b) and 32.4(a). The exceptions to
18  the state's procedural bar are narrow, and the issue raised by petitioner falls outside of
19  this narrow classification.

20  *Recommendation: Ground Two*

21  Petitioner has failed to demonstrate cause and prejudice for this procedural
22  default, and federal habeas review is precluded as a matter of law on this ground for
23  relief raised by Petitioner. *See* 28 U.S.C. § 2254(b). Accordingly, this Court
24  recommends that the District Court find that Petitioner is precluded from obtaining
25  federal habeas relief on this claim.

26

27

28

**Ground Three**

Petitioner argues that the prosecutor in his case knowingly used perjured testimony and vouched for witnesses, in violation of Petitoner's right to due process of law under the constitution.

Respondents argue that Petitioner's third claim is 1) vague and conclusory; and, 2) procedurally defaulted.

This Court finds that Petitioner has failed to raise this claim with the requisite specificity required to support a federal habeas claim.  Petitioner does not identify the basis for his factual claim, nor does he identify any decision by the Arizona courts that resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, pursuant to 28 U.S.C. § 2254(a).  Accordingly, this Court recommends dismissal of this claim.

Alternatively, the Court recognizes that Petitioner alleges that this claim was exhausted in his "State Habeas Corpus," construed by the state courts as a third petition for post conviction relief.  The trial court denied the petition for failure to file a notice of post conviction relief, and further finding that if a notice had been filed, it would have been untimely.  The court of appeals denied review, finding the issues precluded pursuant to Ariz. R. Crim P. 32.2(a)(3).

Petitioner has failed to demonstrate cause and prejudice for this procedural default, and federal habeas review is precluded as a matter of law on this ground for relief raised by Petitioner.  Accordingly, this Court recommends that the District Court find that Petitioner is precluded from obtaining federal habeas relief on this claim.

1

**Ground Four**

2       Petitioner argues that the state's plea agreement with Pintado violated his rights

3   to due process of law by preventing him from properly exercising his right to confront

4   witnesses.

5       Respondents argue that Petitioner's fourth claim is 1) not sufficiently specific to

6   permit habeas review; and 2)  procedurally defaulted.

7       This Court finds that Petitioner has failed to raise this claim with the requisite

8   specificity required to support a federal habeas claim.  Petitioner does not identify the

9   basis for his factual claim, nor does he identify any decision by the Arizona courts that

10   resulted in a decision that was contrary to, or involved an unreasonable application of,

11   clearly established Federal law, as determined by the Supreme Court of the United

12   States; or resulted in a decision that was based on an unreasonable determination of the

13   facts in light of the evidence presented in the State court proceeding, pursuant to 28

14   U.S.C. § 2254(a).  Accordingly, this Court recommends dismissal of this claim.

15       Alternatively, the Court recognizes that Petitioner alleges that this claim was

16   exhausted in his "State Habeas Corpus," construed by the state courts as a third petition

17   for post conviction relief.  The trial court denied the petition for failure to file a notice

18   of post conviction relief, and further finding that if a notice had been filed, it would

19   have been untimely.  The court of appeals denied review, finding the issues precluded

20   pursuant to Ariz. R. Crim P. 32.2(a)(3).

21       Petitioner has failed to demonstrate cause and prejudice for this procedural

22   default, and federal habeas review is precluded as a matter of law on this ground for

23   relief raised by Petitioner.  Accordingly, this Court recommends that the District Court

24   find that Petitioner is precluded from obtaining federal habeas relief on this claim.

25

**Ground Five (Supplemental Brief)**

26       Petitioner argues that trial counsel was ineffective for failing to inform him of

27   the state's offer to allow him to plead guilty to manslaughter.

28

- 38 -

1    Respondents argue that Petitioner's fifth claim is without merit under the

2  appropriate standard of review.

3    In Petitioner's supplemental claim, Petitioner argues that his trial counsel was

4  ineffective for failing to communicate to him the state's offer to allow him to plead

5  guilty to manslaughter.

6    As Respondents note, this claim is not procedurally defaulted.  The state trial

7  court found the claim precluded under Rule 32.3(a)(3), and alternatively rejected the

8  claim on the merits.  The Arizona Court of Appeals, however, did not address the

9  preclusion finding, but addressed and rejected the claim on its merits.

10    Petitioner has failed to submit copies of his petition for post conviction relief to

11  the state court, nor has he submitted a copy of his petition for review to the court of

12  appeals or the Arizona Supreme Court.  The essential facts and argument presented to

13  the state courts, however, can be gleaned from the trial court's and the Arizona Court

14  of Appeals' opinions on Petitioner's Petition for Post Conviction Relief and Petition for

15  Review.  (Petitioner's Supplemental Brief, Appendix A and B.)  While Petitioner

16  objects generally to the court's interpretation, and the basic factual dispute about

17  whether or not he was informed of the plea offer, he does not object to the courts'

18  synopsis of facts presented to the state courts.

19    Petitioner asserted in an affidavit that he had been unaware that the state had

20  offered him a plea to manslaughter until 1992, seven years after his trial.  (*Id.*, p. 1.)

21  The trial court considered the relevant evidence as follows: (1)  Petitioner's counsel,

22  Carol Wittels, wrote in a letter, dated January 21, 1992 that "Sadly, Florentino passed

23  up a plea for Manslaughter, where he would have faced a sentence of 5-15 years in

24  prison"; (2) the sentencing transcript demonstrated that Petitioner's counsel stated

25  during his sentencing "[h]e passed up all plea offers and he would not say what we

26  thought was the most logical defense..."  (3) Ms. Wittels stated in her affidavit that

27  "[t]hroughout my representation of the defendant, he maintained his innocence" and

28                                        - 39 -

1   "[a]lthough I do not recall the specific discussion with my client at present, it was and

2   is my practice to discuss the terms of all plea offers along with the merits of the offer

3   relative to the risks at trial" and "[t]ogether we decided to take the case to trial rather

4   than accept the plea offered." (*Id.*, Appendix A, p. 6)

5          The trial court found that Petitioner did not raise a colorable claim that he did not

6   know about the plea offer.  The trial court stated that the letter implied that Petitioner

7   was the one that decided not to take the plea, nor did he meet his burden of proving that

8   he did not know of the offer until the 1992 letter.  (*Id.*, Appendix A, p. 6)

9          The Court of Appeals stated that the record before the court supported the trial

10  court's finding that Petitioner's counsel had, in fact, discussed all potential plea offers

11  with him before trial, pointing to the sentencing transcript from 1985 that stated that

12  Petitioner's counsel had advised the court that Petitioner had "passed up all plea offers."

13  The court of appeals also found that the letter itself was "substantial evidence that trial

14  counsel advised Santana of the manslaughter offer." (*Id.*, Appendix B, p.2)

15         Petitioner argues that the state court should have granted him a hearing on the

16  issue pursuant to a state court ruling, *State v. Donald*, 198 Ariz. 406, 10 P.3d 1193

17  (App. 2000).   The state court, however, found Petitioner had failed to present a

18  colorable claim of ineffective assistance of counsel.

19         The established law governing the merits of an ineffective assistance of counsel

20  claim is expressed in *Strickland v. Washington*, 466 U.S. 668 (1984).  The general

21  standard for attorney performance is that of "reasonably effective assistance."

22  *Strickland v. Washington*, 466 U.S. 668 (1984).  The *Strickland* test requires Petitioner

23  establish deficient performance by counsel and prejudice resulting from that

24  performance to obtain relief. *See Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002),

25  *amended,* 311 F.3d 928.

26         In this case, Petitioner failed to convince the state courts that, factually, he was

27  not presented with the manslaughter plea.

28                                            - 40 -

1    In a proceeding instituted by an application for a writ of habeas corpus by a

2  person in custody pursuant to the judgment of a State court, a determination of a factual

3  issue made by a State court shall be presumed to be correct. The applicant shall have

4  the burden of rebutting the presumption of correctness by clear and convincing

5  evidence.  28 U.S.C. §§ 2254(d)(2), (e)(1) (2003).

6    Under the AEDPA, "[f]actual determinations by state courts are presumed

7  correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a

8  decision adjudicated on the merits in a state court and based on a factual determination

9  will not be overturned on factual grounds unless objectively unreasonable in light of the

10 evidence presented in the state-court proceeding, § 2254(d)(2)." *Lambert v. Blodgett*,

11 393 F.3d 943, 971 (9th Cir. 2004) (citing *Miller-El*, 537 U.S. at 340, 123 S.Ct. 1029;

12 see also *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003))

13 ("The 'unreasonable application' clause requires the state court decision to be more

14 than incorrect or erroneous. The state court's application of clearly established law must

15 be objectively unreasonable."); *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.2004) ("a

16 federal court may not second-guess a state court's fact-finding process unless, after

17 review of the state-court record, it determines that the state court was not merely wrong,

18 but actually unreasonable"); *Brown v. Poole*, 337 F.3d 1155, 1160 n. 2 (9th Cir.2003)

19 ("We would indeed defer to all factual findings of the state court that are reasonable 'in

20 light of the evidence presented in the state court proceedings.' ") *(quoting Greene v.*

21 *Henry*, 302 F.3d 1067, 1072 (9th Cir.2002))).

22    In this case, the state court's fact-finding was neither wrong nor unreasonable.

23 Petitioner asserts that at the time of sentencing counsel's statement that Petitioner had

24 passed up all plea offers "proves nothing more than what Petitioner had already

25 admitted, *viz.*, that Wittels had made him aware of the state's offer to allow him to plead

26 to second degree intentional murder, which he rejected." (Petitioner's Supplemental

27 Brief, p 10.)

28                                      - 41 -

1    Petitioner further argues that the Court of Appeals' finding that Wittels' 1992
2  letter was substantial evidence is specious, and would result in a disputed material issue
3  of fact that would preclude summary judgment in a civil proceeding.

4    Petitioner's arguments fail for several reasons.  First, applying this Court's
5  deferential review, Petitioner has not presented clear and convincing evidence
6  contradicting the state court's findings.  Second, Petitioner does not assert nor submit
7  an affidavit that he understood counsel's statements at sentencing to refer only to the
8  offer of second degree murder, only that it *could be* interpreted that way.  Third, the
9  statement could not be interpreted that way because the statement referred to multiple
10 plea offers, presumably the second-degree and manslaughter offers, and there is no
11 evidence that there were any other offers.  Fourth, the standard in this case is not the
12 same as a standard for motion for summary judgment; the trial court acts as a fact-finder
13 in a Rule 32 proceeding, and the state court adopted those findings.

14    This Court finds that the state court factual findings are not unreasonable.  The
15 court of appeals found that the trial court's factual findings were supported by the record
16 before the court and that Petitioner did not state a colorable claim of ineffective
17 assistance of counsel for failure to communicate a plea offer based on those findings.
18 This Court finds no factual or legal error in the state's determination.

19    Accordingly, this Court recommends dismissal of the claim raised in Petitioner's
20 Supplemental Brief.

21 //
22 //
23 //
24 //
25 //
26 //
27 //
28

1

**RECOMMENDATION**

2    This Court recommends that the District Court, after its independent review

3 of the record, dismiss this action in its entirety.

4    Pursuant to 28 U.S.C. § 636, any party may serve and file written objections

5 within 10 days of being served with a copy of this Report and Recommendation.  If

6 objections are not timely filed, they may be deemed waived.  If objections are filed

7 the parties should use the following case number: **CIV 01-0226-TUC-DCB**.

8    The Clerk is directed to deliver a copy of this Report and Recommendation to

9 Petitioner and Respondents.

10    DATED this 2nd day of September, 2005.

11

12

13

14
_____
                Bernardo P. Velasco
            United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28